UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Elli LeClair,

        Plaintiff,

v.                                                                             Civil No. 11-3319 (JNE/LIB)
                                                                           ORDER

HealthEast Care System,

        Defendant.

Plaintiff Elli LeClair ("LeClair") sued Defendant HealthEast Care System ("HealthEast") for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01, et seq., alleging disability discrimination and failure to accommodate. This case is before the Court on HealthEast's motion for summary judgment. For the reasons stated below, the Court denies HealthEast's motion.

## I.     BACKGROUND[1]

In 2007, LeClair began working for HealthEast as an Education and Development Specialist ("EDS"). As part of her duties, LeClair scheduled and taught life-support classes to HealthEast nurses, recruited and mentored instructors who also taught those classes, and kept records.

In August 2009, LeClair underwent neck surgery. As a complication from this procedure, one of LeClair's vocal cords became partially paralyzed. Because of her neck and vocal cord conditions, LeClair took a medical leave of absence covered by the Family and Medical Leave

---

[1]     The facts are viewed in the light most favorable to LeClair.

1

Act ("FMLA").[2] By November 11, 2009, LeClair had exhausted her FMLA leave, but she was still unable to return to work. HealthEast allowed LeClair to continue her medical leave of absence.

Separate from the neck and vocal cord conditions, LeClair also had a knee problem. At some point after she had knee surgery (which was also in August 2009), LeClair developed a stress fracture in her knee. She first informed her supervisor about the stress fracture on November 25. She said that she could bear little to no weight on the affected leg. On December 6 she informed her supervisor that the stress fracture had not yet healed but that she could use crutches at work. LeClair was still unable to return to work because of her voice, and her supervisor began looking for temporary help in the EDS position. A temporary employee—hired on an on-call, as-needed basis—began in the EDS position on December 21.

On December 23, LeClair received a doctor's note regarding her vocal cord condition, releasing her to return to work with no voice restrictions. LeClair faxed that note to HealthEast on December 24, but HealthEast denies ever receiving that note. Also on December 23, LeClair's neurosurgeon, who was treating LeClair for her neck condition, released LeClair to return to full duty as of December 30. At a point not specified in the record, LeClair called her supervisor and informed her of the neck release. On December 27, LeClair emailed her supervisor and told her that she was planning to acquire a hard copy of the neck release on December 28. There is no evidence in the record that LeClair acquired the hard copy or that she sent it to HealthEast.

---

[2]     Under the FMLA, employees are entitled to 12 weeks of unpaid leave during any 12-month period for, among other things, a serious health condition when the condition makes the employee unable to perform at work. 29 U.S.C. § 2612(a)(1)(D).

In the December 27 email, LeClair informed HealthEast that she wanted to return to work on December 30 even though she was feeling "gravely" because she did not want to lose her benefits. She also stated in that email that she would need crutches for her knee. According to LeClair, her supervisor called her on December 28 and told her not to come into work. On December 29, LeClair informed her supervisor that her stress fracture had not healed but that her doctor told her that she did not need to be off work, just off the leg.

Around this time, LeClair's supervisor met with human resources personnel and discussed LeClair's leg and voice limitations and whether HealthEast could accommodate LeClair; LeClair's supervisor concluded that LeClair could not perform the essential functions of her job even with a reasonable accommodation. On December 31, LeClair's supervisor informed LeClair that she was terminated for business reasons. In January 2010, HealthEast informed LeClair that the stress fracture in her knee and LeClair's vocal abilities made her unable to perform her job and that HealthEast was incapable of accommodating LeClair. LeClair responded that she could perform the essential functions of her job using crutches; she also noted that she was able to speak clearly for extended periods of time. LeClair requested reinstatement, which HealthEast denied. HealthEast hired the temporary, nondisabled employee to the EDS position on a permanent basis.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce

3

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

LeClair claims HealthEast violated the ADA and the MHRA by discriminating against her because of her disability and by failing to accommodate her. Although it is undisputed that LeClair had medical conditions involving her neck, her vocal cord, and her knee, in her Complaint LeClair identified only the vocal cord and knee issues as her disabilities. In her brief she seems to assert that when she was terminated she was no longer disabled because of her vocal cord since her physician had released her to use her voice without any restrictions. Therefore, LeClair's knee condition is the disability that forms the basis of LeClair's disability discrimination and failure-to-accommodate claims.

### A. Disability Discrimination

To establish a prima facie case of discrimination, LeClair must show that she (1) was disabled within the meaning of the ADA, (2) was a qualified individual under the ADA, and (3) suffered an adverse employment action because of her disability.[3] *Kallail v. Alliant Energy Corp. Servs,. Inc.*, 691 F.3d 925, 930 (8th Cir. 2012). HealthEast then has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action, and LeClair must show that HealthEast's proffered reason was pretext for discrimination. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008). Other than one difference not relevant here, "an MHRA

---

[3] A plaintiff may prove discrimination either through direct evidence or under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998). Here, the parties do not dispute that LeClair's disability discrimination claim should be analyzed under the burden-shifting framework.

claim proceeds the same way as does a claim under the ADA." *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) (quotation omitted).

For purposes of this motion, HealthEast has conceded that LeClair's knee condition was an ADA-qualifying disability. HealthEast does not appear to dispute that LeClair was terminated because of that disability. Consequently, the only prong of the prima facie case at issue is whether LeClair was qualified. "The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007) (quotation omitted). "To be a qualified individual under the ADA, an employee must (1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Kallail*, 691 F.3d at 930 (quotation omitted). HealthEast does not argue that LeClair did not possess the necessary skills for her job; instead, HealthEast argues that LeClair could not perform the essential functions of the EDS position.

Health argues first that LeClair could not perform any of the essential functions of her job because she could not return to work. HealthEast has a policy that requires employees who return to work after a leave of absence for a personal medical condition to present their supervisors with medical releases. HealthEast argues that it did not have medical releases for any of LeClair's medical conditions, so LeClair was unable to return to work per the policy. For her vocal cord condition, LeClair asserts that she sent HealthEast a release for her vocal cord on December 23. HealthEast denies receiving that release. Because Court must view the facts in the light most favorable to LeClair, the Court determines that LeClair sent the release to HealthEast. For the neck condition, LeClair asserts that she told HealthEast that she had a release for her neck. She

also told her supervisor in an email on December 27 that she was picking up a hard copy of the neck release on December 28. Viewing the facts in the light most favorable to LeClair, HealthEast knew LeClair had been released for her neck condition and that she was picking up a hard copy of the release. Finally, the parties disagree about whether LeClair was on leave for her knee condition and consequently whether she needed a release for her knee to return to work. The record contains an email from LeClair to her supervisor dated November 25, 2009, where LeClair stated that the stress fracture for her knee "is not covered under [her] reason for being off." The record does not contain undisputed evidence that LeClair was on leave for her knee. There is a fact issue about whether LeClair was on leave for her knee and consequently whether she needed to submit a release for her knee before returning to work. Therefore, the Court concludes that there is a genuine issue of material fact about whether LeClair could return to work under HealthEast's medical release policy.

HealthEast also argues that LeClair was not able to perform any of the essential functions of her job because LeClair told her supervisor that she was unable to return to work. HealthEast's argument hinges on LeClair's December 29 email to her supervisor, where LeClair said that she was not coming into work on December 30. But viewing the facts in the light most favorable to LeClair, LeClair informed her supervisor on December 27 that she wanted to return to work on December 30. On December 28, LeClair's supervisor told LeClair to not come into work. In the December 29 email, LeClair acknowledged that she intended to return to work on December 30 but that she understood her supervisor told her not to come in. Viewing the facts in

the light most favorable to LeClair, the Court cannot say as a matter of law that LeClair told HealthEast she was unable to come into work.[4]

HealthEast also contends that LeClair could not perform the essential function of teaching life-support classes, which required the physical demonstration of CPR.[5] LeClair asserts that teaching these classes is not an essential function of the EDS position. "Essential functions of a position are the fundamental duties of the job, but not its marginal functions." *Kallail*, 691 F.3d at 930. To determine whether a job function is essential, courts consider, among other things, "the employer's judgment as to which functions are essential," "the amount of time spent on the job performing the function," and "the current work experience of incumbents in similar jobs." *Id.* (quotation omitted). LeClair contends that teaching life-support classes was not an essential function of the EDS position because the person who was hired to replace LeClair

---

[4] HealthEast also argues that LeClair asserted in an application for Social Security disability benefits dated January 1, 2010 that she was unable to work. Although pursuing Social Security disability benefits does not preclude a plaintiff from pursuing an ADA claim, a plaintiff cannot ignore her assertion in a Social Security disability application that she was too disabled to work. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797–98 (1999). "To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" *Id.* at 798. In her Social Security application, LeClair wrote that she was terminated on December 31, 2009, and since her termination, she had knee surgery and was unable to work. LeClair first asserts that she filled out the application but does not remember turning it in. Second, LeClair argues that she has sufficiently explained why the comments in her application are consistent with her ADA claim. LeClair asserts that she chose to have knee surgery in March 2010, and after her knee surgery, she filled out the application for Social Security disability benefits but backdated it to January 1, 2010, because that was the time she had first spoken to the Social Security Administration. She asserts that at the time she filled out the form, she was unable to work because she was recuperating from knee surgery. The Court concludes that LeClair's explanation is sufficient for her to survive summary judgment.

[5] HealthEast also argues that speaking was an essential function of the EDS position and that LeClair was unable to speak because of her vocal cord condition. But LeClair's doctor released her to use her voice without restrictions on December 23, more than one week before her termination. The record does not show that LeClair could not perform the essential function of speaking.

7

temporarily was not certified to teach those classes. The temporary position, however, was casual and on-call, with no guaranteed hours. When HealthEast offered the temporary employee the permanent position, HealthEast made becoming certified to teach life-support classes a condition of hire for the permanent position. Further, at her deposition, LeClair testified that she spent on average around 25 hours per week "doing demonstrations or teaching." HealthEast has shown that an essential function of the EDS position was teaching.

If a plaintiff cannot perform the essential functions of her job without a reasonable accommodation, then she must "make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job." *Id.* at 932 (quotation omitted). Once the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to show that it is unable to accommodate the employee." *E.E.O.C.*, 477 F.3d at 569 (emphasis and quotation omitted). Here, LeClair could not perform her teaching duties without crutches, but she asserts that crutches would have been a reasonable accommodation. LeClair points to a February 8, 2010 letter she wrote to HealthEast in which she asserted that on crutches she could "walk, stand and teach" and "could handle all of the teaching of the classes." LeClair also asserted in a declaration that the mannequins on which the CPR demonstrations were done were on carts or tables. She asserts that when she taught life-support classes, she was not kneeling on the ground doing compressions on a mannequin. LeClair has made a facial showing that her using crutches was a reasonable accommodation. HealthEast made no argument that it was unable to accommodate LeClair. Thus, LeClair has made a sufficient showing that she is qualified.

Because LeClair has made a prima facie showing of discrimination, HealthEast must articulate a legitimate, nondiscriminatory reason for the adverse employment action. HealthEast

8

asserts that it discharged LeClair because of her inability to return to work and her failure to advise HealthEast of her expected return-to-work date. LeClair argues that HealthEast's reason is pretextual. "To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (quotation omitted). Here, LeClair produced evidence that she was able to return to work. She sent HealthEast a medical release for her vocal cord on December 23, informed her supervisor that she was getting a medical release for her neck on December 28, and informed her supervisor that she could return to work on December 30 but would need to use crutches. LeClair did give her supervisor a return-to-work date—December 30—but her supervisor called her on December 28 and told her not to come in on December 30. LeClair also presented evidence that at the time of her termination, HealthEast told her she was terminated because of business reasons; not until several days later did LeClair discover that she was terminated because of her medical conditions and that HealthEast did not believe it could accommodate her conditions. *See Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1023 (8th Cir. 1998) (noting that employer's inconsistent statements about employee's termination created a fact issue as to whether employer's reason for terminating employee was pretextual and supported an inference that discrimination was the actual reason for employee's termination). Viewing the facts in the light most favorable to LeClair, LeClair has shown that HealthEast's articulated reasons for her termination were pretext for discrimination. Therefore, the Court concludes that there are genuine issues of material fact on LeClair's ADA and MHRA disability discrimination claims and denies HealthEast's motion for summary judgment on those claims.

**B. Failure to Accommodate**

For a failure to accommodate claim, LeClair also must make a prima facie showing that she is disabled, is a qualified individual, and suffered an adverse employment action because of her disability. *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008). As discussed above, LeClair has made a sufficient prima facie showing.

A failure-to-accommodate claim also requires the employee to make a request for accommodation. *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). However, "an employee is not required to request accommodation in writing, or to use the magic words of 'reasonable accommodation.'" *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 n.5 (8th Cir. 1999). "If an employee fails to make a request for accommodation, then his employer has no duty to accommodate." *Bubolz*, 523 F.3d at 870. "If, however, an employee does request an accommodation, the employer must engage in an interactive process to determine whether reasonable accommodations are possible." *Id.*

HealthEast argues that LeClair did not request an accommodation—namely, crutches—until after she was terminated.[6] However, the record shows that LeClair sent an email to her supervisor on December 6, 2009, informing her supervisor that she had a stress fracture in her knee but that she could use crutches at work. On December 27, LeClair also informed her supervisor that she would need crutches for her knee. Although LeClair did not use the magic words "reasonable accommodation," prior to her termination LeClair twice informed her employer of her knee condition and of the need for her to use crutches at work. The record also

---

[6] In her February 8, 2010 letter to HealthEast, LeClair argued that crutches, a stool, and a microphone would be reasonable accommodations. For this motion, however, LeClair only argued that crutches would be a reasonable accommodation.

shows that HealthEast did not engage in an interactive process with LeClair but instead assessed, by itself and without any input from LeClair, whether LeClair could perform the essential functions of the EDS position on crutches. The Court concludes that there are genuine issues of material fact regarding LeClair's ADA and MHRA failure-to-accommodate claims and denies HealthEast's motion for summary judgment on those claims.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Motion for Summary Judgment [Docket No. 15] is DENIED.

Dated: February 25, 2013

s/Joan N. Ericksen  
JOAN N. ERICKSEN  
United States District Judge